# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PACIRA BIOSCIENCES, INC. and PACIRA CRYOTECH, INC., | ) ) ) | |
| Plaintiffs/Counterclaim-Defendants, | ) ) ) ) | |
| v. | ) ) | C.A. No. 2020-0694-PAF |
| FORTIS ADVISORS LLC, solely in its capacity as representative of the former securityholders of MYOSCIENCE, INC., | ) ) ) ) ) | |
| Defendant/Counterclaim-Plaintiff. | ) ) ) | |

## MEMORANDUM OPINION

Date Submitted: March 11, 2024
Date Decided: January 21, 2025

Lisa A. Schmidt, Raymond J. DiCamillo, Kevin M. Kidwell, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Anne Champion, Zainab Ahmad, Timothy Sun, Maya Danaher, GIBSON, DUNN & CRUTCHER LLC, New York, New York; *Attorneys for Plaintiffs/Counterclaim-Defendants Pacira BioSciences, Inc. and Pacira CryoTech, Inc.*

Lauren K. Neal, Courtney Kurz, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Christopher J. Marino, Taylor P. Lovejoy, DAVIS MALM & D'AGOSTINE, P.C., Boston, Massachusetts; *Attorneys for Defendant/Counterclaim-Plaintiff Fortis Advisors LLC.*

**FIORAVANTI, Vice Chancellor**

Two corporations agreed that it would be in their mutual interest for one to acquire the other but were unable to agree on an up-front purchase price. To bridge the gap, they attempted to create objective milestones to measure the target's success in the following years and conditioned almost half of the merger consideration on achievement of certain conditions. After closing, a dispute arose over whether some of those conditions had been triggered. In other words, this is an earnout case.

This is, for the parties, a $30 million question. For the court, it is one of contract interpretation. At issue in this post-trial opinion are the meanings of two phrases in the earnout provision. Under the contract, certain earnout payments are tied to the reimbursement rate for a medical procedure using the target's device. Reimbursement rates are set using procedural code numbers, and they vary based on the care setting and by locality. The parties dispute whether the contract ties the earnout payment to a national benchmark reimbursement rate or a locality-adjusted reimbursement rate. The buyer insists that the contract contemplates use of a national rate. The sellers argue that local rates control. On this issue, the court concludes that the contract is ambiguous and that the extrinsic evidence overwhelmingly supports the buyer's interpretation.

The parties also dispute whether the applicable reimbursement rate is tied to a single, specific reimbursement code or could be triggered by multiple reimbursement codes. On this issue, the contract is unambiguous, and the earnout

is not limited to a single, specific reimbursement code. Nevertheless, the sellers have not proved, as a matter of fact, that the earnout was triggered under their other proffered codes. Accordingly, judgment will be entered in favor of the buyer.

## I.   BACKGROUND

These are the facts as the court finds them after trial.[1]

### A.   The Parties

In 2019, Pacira Biosciences, Inc. ("Pacira") acquired MyoScience, Inc. ("MyoScience").[2] At the time of the merger, MyoScience had one product: iovera® ("iovera"), a handheld medical device used primarily for pain relief.[3]

The terms of the acquisition are contained in an Agreement and Plan of Merger, dated March 4, 2019, by and among Pacira Pharmaceuticals, Inc.,[4] PS Merger, Inc., MyoScience, and Fortis Advisors LLC ("Fortis"), as the

---

[1] Other factual findings are contained in the analysis of the claims. The trial record consists of trial testimony from ten witnesses, deposition testimony from 15 witnesses, and 248 exhibits. Deposition testimony is cited as "(Surname) Dep."; trial exhibits are cited as "JX"; stipulated facts in the pre-trial order are cited as "PTO"; and references to the docket are cited as "Dkt.," with each followed by the relevant section, page, paragraph, exhibit, or docket number. Trial testimony is cited in the form "Tr. (X)," with "X" representing the surname of the speaker. After being identified initially, individuals are referenced herein by their surnames without regard to formal titles such as "Dr." No disrespect is intended.

[2] PTO ¶¶ 43, 79. Pacira CryoTech, Inc. is the successor to MyoScience. *Id.* ¶ 41.

[3] *Id.* ¶¶ 69–70; JX 2 at 2.

[4] Pacira Pharmaceuticals, Inc. changed its name to Pacira Biosciences, Inc. (*i.e.*, Pacira) after the merger. PTO ¶ 2 n.1.

Securityholders' Representative (the "Merger Agreement").[5]  Fortis serves as the

representative for certain former MyoScience securityholders, including the

beneficiaries of the earnout payments at issue in this action.[6]  A group of former

MyoScience securityholders directs Fortis's actions with respect to the Merger

Agreement (the "Advisory Group").[7]

### B.     CPT Codes and CMS Reimbursement Rates

When billing for a medical procedure, health care providers must submit a bill

for their services using standardized diagnosis and procedure codes.[8]  Among these

procedure codes are Category I Current Procedural Terminology ("CPT") codes,

numerical codes ranging from CPT code 00100 to 99499, each of which corresponds

to a specific procedure.[9]  The American Medical Association ("AMA") defines and

updates the CPT codes.[10]  The Centers for Medicare and Medicaid ("CMS") set, and

---

[5] JX 101.

[6] *Id.* at 6, 17–18, 105, 114; PTO ¶ 42.

[7] PTO ¶ 44.  The current members of the Advisory Group are Brian Farley, Valiance Asset Management Ltd. ("Valiance"), and AMV Partners I, L.P. ("AMV").  *Id.*  Farley was the chair of MyoScience's board of directors from April 2018 until the merger.  *Id.* ¶ 51.  Jan Pensaert is Valiance's designee and Anthony Lando is AMV's designee.  *Id.* ¶ 44.  The original members of the Advisory Group were Lando, Pensaert, and Timothy Still.  *Id.*  Still was MyoScience's chief executive officer from October 2018 until the merger.  *Id.* ¶ 50.  Still left the Advisory Group after he was served as a defendant under the original complaint in this action in August 2020.  *Id.* ¶ 44.

[8] *Id.* ¶ 59.

[9] *Id.* ¶ 60.

[10] *Id.* ¶¶ 4, 19.

annually update, how much Medicare—a major insurance provider—will reimburse health care providers for each CPT-coded procedure.[11] The amount Medicare pays for a procedure varies depending on the care setting, resulting in different rates in hospital outpatient, ambulatory surgery center ("ASC"), and physician's office settings.[12] That, however, is not the only variable.

CMS releases "national" reimbursement rates for each CPT code, but the national reimbursement rate is not the exact amount a medical professional would receive from Medicare if reimbursed for the procedure.[13] Care providers are paid based on a calculation that produces a "locality-adjusted" reimbursement rate that takes into account the relative cost of care in the geographic location where the patient is served.[14] For example, in 2020, the geographic wage index of different places across the country ranged from 0.7543 to 1.8551.[15] Thus, depending on where a procedure was performed, the amount that Medicare would reimburse a medical professional could vary significantly.[16] By contrast, the artificial national

---

[11] *Id.* ¶ 61; Tr. 15:10–11 (Stack).

[12] PTO ¶ 61.

[13] "The existence of a CPT code does not guarantee payment of any particular procedure. Payment of any procedure by Medicare is predicated, for example, on the medical necessity of the service and adequate documentation of the procedure." *Id.* ¶ 63.

[14] *Id.* ¶ 64.

[15] JX 231 ¶ 59.

[16] *Id.* ¶¶ 57–60.

reimbursement rate assigned to each CPT code is the dollar value output if all modifiers in the payment calculation are set to 1.[17] Due to the variability across different localities, the national reimbursement rate is used in the industry as a reference point to compare the reimbursement rates for various procedures.[18]

### C.    iovera and CPT Codes

iovera is a patented handheld medical device with Class II U.S. Food and Drug Administration ("FDA") clearance.[19] iovera delivers "intense (extreme) cold via closed-end needles called 'Smart Tips'" to targeted locations, temporarily destroying peripheral nerves and thereby preventing the transmission of pain signals to the brain.[20] The base iovera device is reusable, but the Smart Tip needles that deliver the cold to the target location are single use.[21]

---

[17] Tr. 869:16–870:4 (Yeung). "It is a fictitious, artificial number that provides a useful, shorthand way to compare differences in national rates between different CPT codes." Def.'s Reply Br. 13.

[18] JX 231 ¶¶ 61, 74, 84; *see also* Tr. 893:4–18 (Yeung) ("Q.  And you think that national rates are used in the industry to compare reimbursement for different items and services. Correct?  A.  That's correct.  I think they can be used to compare different items and services.  Q.  And national -- you also think national rates can be helpful to compare reimbursement across different sites of service.  Correct?  A.  Correct.  Q.  And if one didn't know where a service was being performed, you think that a national rate would be helpful to give a general idea of how that service is reimbursed.  Correct?  A.  The national rate can be helpful, yes, to give a general idea.").

[19] JX 2 at 2; JX 4 at 4.

[20] PTO ¶ 70.

[21] JX 21 at 5.

iovera's 510(k) clearance from the FDA permits application of the product to peripheral nerves throughout the body, but makes special note of iovera's use "for the relief of pain and symptoms associated with osteoarthritis of the knee for up to 90 days."[22] Indeed, since iovera's introduction to the market in 2014, it has primarily been used on the genicular nerves to treat knee pain associated with arthroplasty and osteoarthritis.[23] MyoScience's commercial focus was to "own the knee."[24] This objective was in large part due to promising data from clinical studies demonstrating iovera's efficacy in the knee[25] and the large potential market for pain treatment in the knee.[26]

---

[22] PTO ¶ 71.  iovera's 510(k) clearance from the FDA provides:

> The iovera system is used to destroy tissue during surgical procedures by applying freezing cold.  It can also be used to produce lesions in the peripheral nervous tissue by the application of cold to the selected site for the blocking of pain.  It is also indicated for the relief of pain and symptoms associated with osteoarthritis of the knee for up to 90 days.  The iovera system is not indicated for treatment of central nervous system tissue.

*Id.*; *see* JX 4 at 3, 5.

[23] JX 21 at 4.

[24] JX 8 at 8, 32, 56.

[25] JX 3 at 18–19.  The presence of clinical studies and associated data is essential to the commercialization of a medical device or product.  Tr. 373:11–374:7 (Kleinhans).

[26] Tr. 507:23–508:5 (Farley) (discussing MyoScience's market penetration into pain treatment for knee-replacement surgery, a procedure performed about a million times each year); *see also id.* at 11:11–17 (Stack) ("Q:  Is there anything in particular about the knee market?  A:  It's a large market and -- roughly a million patients a year.  And it is very painful.  And so, you know, no matter what we do in the marketplace, the pain profile of a total knee arthroplasty is such that it can always be improved.").

6

Like other medical devices, the commercial success of iovera is heavily influenced by the reimbursement rates clinicians and health care providers receive for its use.[27] Prior to the merger, MyoScience saw a large potential market for iovera, but low CMS reimbursement rates under CPT code 64640.[28] Thus, physicians had to take a loss on a procedure using iovera, which discouraged widespread adoption.[29] Were Medicaid's reimbursement rates for procedures using iovera to meet or exceed physicians' costs, physician demand for iovera, and, therefore, the value of MyoScience, was expected to increase.[30]

In May 2018, the AMA announced a new CPT code, then temporarily labeled as "64xx1," to report destruction of genicular nerves by a neurolytic agent, which was expected to take effect in 2020.[31] The application that led to 64xx1 pertained primarily to a different medical device called "COOLIEF," which used a targeted

---

[27] *Id.* at 360:12–24 (Kleinhans); *id.* at 14:12–15:19 (Stack); *id.* at 119:8–120:5 (Ellis).

[28] *Id.* at 507:19–508:24, 530:4–15 (Farley).

[29] *Id.* at 508:12–24 (Farley); *id.* at 530:4–532:2 (Farley) ("Q: [I]t was very difficult for doctors who were using the iovera device in the clinic to turn any sort of profit. Right? A: It would have been the exception, yes. . . . Q: And that factor was hindering adoption of the iovera device in the marketplace? A: We were still growing 100 percent year over year, but we thought we could do better with better reimbursement. . . . Anytime you ask a doctor to not get compensated for their time, and possibly not even have the reimbursement cover the cost of the supply, that would be a headwind.").

[30] *Id.* at 128:10–14 (Ellis); *id.* at 22:11–18 (Stack).

[31] PTO ¶ 75; *see* JX 30.

application of heat to relieve pain by killing nerves.[32] Because the creation of 64xx1 was responsive to an application relating to COOLIEF, which utilized a different method of treatment and targeted different parts of the knee, there was a risk that 64xx1 would not be applicable to reimburse for iovera.[33] Nevertheless, MyoScience was hopeful that the new CPT code would cover iovera and took affirmative steps to influence the parameters of the new CPT code to ensure its applicability to iovera.[34] If the finalized code applied to iovera, it would bode well for MyoScience's commercial prospects, as COOLIEF's higher input costs would be reflected in the reimbursement rate for CPT code 64xx1.[35] MyoScience learned about this potentially significantly accretive CPT coding change in May 2018, but the uncertainty surrounding the scope and reimbursement level of the potential new CPT code also created challenges in valuing iovera and MyoScience.[36]

---

[32] Tr. 511:11–512:14 (Farley); *id.* at 97:20–98:23 (Stack).

[33] *Id.* at 438:6–9 (Kleinhans); *id.* at 542:16–543:8 (Farley); JX 65 at 1, 3.

[34] Tr. 513:4–16 (Farley); JX 65 at 1 ("There is not much in control [sic] at this point. We will have our attorney present at the upcoming February meeting to make sure our case is appropriately represented and no one provides incorrect information to the committee."); *id.* at 1 (Farley responding to the inquiry "how can we increase the number of RVUs for the iovera treatment?" stating that "We can't. . . . If we tried to influence doctors about this, it would violate the AMA rules . . . ."); *id.* at 2 ("We've already sent in this cost information and it's been accepted by the RUC.").

[35] Tr. 538:18–539:22 (Farley); JX 65 at 3.

[36] While iovera has other uses, there was no immediate prospect for another new CPT code that would be accretive to MyoScience's value. Applying for a new CPT code requires

8

## D. Pacira and MyoScience Explore a Partnership, Then a Merger.

In the late summer of 2018, Pacira and MyoScience began discussing a "possible partnership."[37] Like MyoScience, Pacira, at the time, sold a single, non-opioid pain relief product: EXPAREL® ("EXPAREL"), which was FDA approved for post-surgical acute pain control.[38] The effects of iovera and EXPAREL were complementary,[39] and early discussions focused on a co-promotion partnership proposing a non-opioid pain management protocol[40] and Pacira making an equity

---

five published papers showing clinical evidence, so when MyoScience was negotiating with Pacira, "[t]here [was] nothing to be done today regarding getting codes for the use of iovera for treatment of other nerve branches" because MyoScience was "quite away from having this." JX 65 at 2.

[37] PTO ¶ 72.

[38] Tr. 6:9–24 (Stack); *id.* at 110:12–18 (Ellis).

[39] JX 21 at 4 ("When used in combination, there is an additive effect with a higher likelihood for a completely opioid-free patient journey."); Tr. 8:6–19 (Stack) ("And so we saw the MyoScience asset as a way to complement the use of EXPAREL. So, you know, use the MyoScience device a couple of weeks to a month before the surgery and allow the patient to undergo what we call 'prehabilitation,' start going up and down stairs, get out of the wheelchair, et cetera. You would use EXPAREL, then, for the acute pain of the surgical procedure itself, the total knee arthroplasty. And then that would take you through the acute pain cycle, the three- or four-day cycle. And then you would still benefit from iovera when you went into physical therapy and you had the extended duration of pain based on activity and early ambulation.").

[40] Tr. 11:7–10 (Stack) ("[I]t made sense to be talking to the same clinicians about a protocol of care that would provide additional benefit when used together."); *id.* at 376:10–21 (Kleinhans) ("The opportunity to be able to have a protocol was very important to Ron to think about having something that they could have before the surgery with iovera, during the surgery with EXPAREL, after the surgery -- they had just signed a strategic deal -- recently signed a strategic deal with J&J for extra-strength Tylenol. There was this alignment between the strategies of the company to be able to create opioid-free protocols for surgeries. And that was a very powerful message that he was delivering to me and something that resonated with me based on how much I believed in our product.").

investment in MyoScience.[41]  The arrangement would provide Pacira an entry-point into the chronic pain market[42] and allow MyoScience to expand its commercial reach through Pacira's well-developed, internal sales force.[43]

By December 2018, the proposed structure of the transaction shifted to Pacira acquiring MyoScience in its entirety.[44]  Unsurprisingly, the parties struggled to reach an agreement on a purchase price.[45]  They resolved to employ an expanded earnout mechanism to bridge the gap.[46]

On January 2, 2019, Pacira and MyoScience executed a final term sheet, which contemplated Pacira purchasing 100% of the equity interests in MyoScience

---

[41] JX 21 at 2, 4, 9.

[42] Tr. 111:22–112:1 (Ellis) ("The concept is [iovera] could be complementary for Pacira in the knee operative setting as well as offer Pacira an entree into the chronic pain setting.").

[43] *Id.* at 112:23–113:2 (Ellis); *id.* at 764:11–16 (Still); *id.* at 382:3–11 (Kleinhans) ("[Pacira] had a pretty extensive sales force with over 200 sales reps . . . .  And so the conversation, as I recall, was they were going to go to their direct sales force to sell our product and to -- as they were selling EXPAREL.  And then that we were looking at how we were going to terminate the distributor relationships that we had on our side.").

[44] JX 31.

[45] Tr. 766:16–767:1 (Still) ("Q:  What was the amount that the board of directors originally demanded from Pacira?  A.  225 million.  Q.  And do you remember what Pacira's first offer to MyoScience was?  A.  It was around 140, 145 million.  Q.  And of that amount, how much was -- was it all -- how was that amount spread out?  A.  It was about 90 or 95 million was cash up front, and then the balance was on the sales goal.").

[46] *Id.* at 137:10–16 (Ellis); *compare id.* at 201:2–5 (Ellis) ("Q:  Do you remember roughly how much the first offer was?  A:  The upfront was less than 100 million, and then 50 sounds right for the milestones."), *with* JX 59 at 2–5 (providing, in the final indication of interest, an offer of $120 million in cash up-front and up to an additional $100 million in the earnout), *and* JX 101 (providing, in the final agreement, $120 million in cash up-front and up to an additional $100 million in the earnout).

for up to $220 million, consisting of an upfront payment of $120 million and $100 million in potential milestone payments.[47]  The term sheet attached half of the value of the potential milestone payments to three CMS reimbursement-related milestones.[48]

### E.  The Merger Agreement

The parties executed the Merger Agreement on March 4, 2019[49] and consummated the transaction on April 9, 2019.[50]  The upfront purchase price was $120 million.[51]  Thereafter, qualifying former MyoScience stockholders or option holders (the "Escrow Participants") were entitled to up to $100 million in contingent earnout payments ("Milestone Payments"), with $50 million of the Milestone Payments tied to CMS reimbursement rates (the "CMS Reimbursement

---

[47] PTO ¶ 74; JX 59 at 2–5.

[48] PTO ¶ 74; JX 59 at 5.

[49] PTO ¶ 77; JX 101.

[50] PTO ¶ 79.  Section 9.7 of the Merger Agreement provides that:

> This Agreement and all disputes and controversies arising hereunder will be governed by and construed in accordance with the Laws of the State of Delaware without reference to any jurisdiction's principles of conflicts of law.  Each Party irrevocably consents to the exclusive jurisdiction of and venue in any state or federal court located in the State of Delaware in connection with any matter based upon or arising out of, or with respect to, this Agreement or the matters contemplated herein, and waives and covenants not to assert or plead any objection which such Party might otherwise have to such jurisdiction and venue . . . .

JX 101 § 9.7.

[51] PTO ¶ 77.

Milestones").[52]   The Milestone Payments could be achieved between January 1, 2019 and December 31, 2023 (the "Milestone Achievement Period").[53]   Some of the CMS Reimbursement Milestones were worth more if achieved earlier.[54] Specifically, Section 1.15(a)(iv) of the Merger Agreement provides:

> (iv) *CMS Reimbursement Milestones*. Parent will pay the Escrow Participants an amount equal to:
>
> > (1) in the case of reimbursement related to use of the Smart Tip Products to treat a patient in the office setting, (A) $20,000,000, if CMS Reimbursement is effective in fiscal year 2020 in an amount equal to or greater than $600.00 per such procedure using such product pursuant to CPT Code 64xx1 (or a different code that is appropriate to describe a procedure in which the Smart Tip Products are used), or in the alternative only, (B) in the event that the condition in subclause (iv)(1)(A) is not met, $10,000,000, if CMS Reimbursement is effective at any time during the Milestone Achievement Period after the end of fiscal year 2020 in an amount equal to or greater than $600.00 per such procedure using such product pursuant to CPT Code 64xx1 (or a different code that is appropriate to describe a procedure in which the Smart Tip Products are used);
> >
> > (2) in the case of reimbursement related to use of the Smart Tip Products to treat a patient in the ambulatory surgery centers setting, (A) $20,000,000, if CMS Reimbursement is effective in fiscal year 2020 in an amount equal to or greater than $800.00 per such procedure using such product pursuant to CPT Code 64xx1 (or a different code that is appropriate to describe a procedure in which the Smart Tip Products are used), or in the alternative only, (B) in the event that the condition in subclause

---

[52] JX 101 § 1.15(a).

[53] *Id.* § 1.15(b)(i).

[54] *Compare id.* § 1.15(a)(iv)(1)(A), *with id.* § 1.15(a)(iv)(1)(B); *compare id.* § 1.15(a)(iv)(2)(A), *with id.* § 1.15(a)(iv)(2)(B).

(iv)(2)(A) is not met, $10,000,000, if CMS Reimbursement is effective at any time during the Milestone Achievement Period after the end of fiscal year 2020 in an amount equal to or greater than $800.00 per such procedure using such product pursuant to CPT Code 64xx1 (or a different code that is appropriate to describe a procedure in which the Smart Tip Products are used); or

(3) in the case of reimbursement related to use of the Smart Tip Products to treat a patient in the out-patient hospital setting, $10,000,000, if CMS Reimbursement is effective at any time during the Milestone Achievement Period in an amount equal to or greater than $1,400.00 per such procedure using such product pursuant to CPT Code 64xx1 (or a different code that is appropriate to describe a procedure in which the Smart Tip Products are used).[55]

## F.    Post-Merger Events

On July 29, 2019, CMS issued proposed—but not yet final—reimbursement rates for 2020, including for CPT code 64xx1.[56]  Pacira reviewed the preliminary national reimbursement rates for CPT code 64xx1 and stated that, based on the proposed reimbursement rates, there was "no iovera milestone triggered."[57] Internally, Still expressed that he "want[ed] to make sure that Pacira is not missing anything here that will wind up costing myoscience shareholders 3 milestones based

---

[55] PTO ¶ 78; JX 101 § 1.15(a)(iv).

[56] PTO ¶ 80.

[57] *Id.*; JX 125 at 2; Tr. 172:8–173:9 (Ellis) (explaining that the reimbursement rates identified in JX 125 "reflect the national reimbursement for the proposed CPT code 64xx1 by the three sites of care").

on proposed rates."[58] To improve the chances that the reimbursement rates for CPT code 64xx1 would be increased, Still sought to re-engage Gail Daubert, a reimbursement attorney who had worked with MyoScience in the past.[59] Still also told Dave Stack, Pacira's chief executive officer and board chair, that the preliminary rates were "fraught with misinformation and miscalculations," and offered his "assistance" to Pacira to "correct the misinformation / miscalculations."[60] Fortis, through counsel, sent a letter to Pacira contending that Pacira was unreasonably delaying in its efforts to increase the value of 64xx1,[61] and former MyoScience securityholders expressed concern internally.[62] On September 13, 2019, Pacira "urg[ed] CMS to revise the proposed valuation of new CPT code 64xx1," which by then was identified as 64624.[63]

CMS issued the final 2020 reimbursement rates in November 2019.[64] Internally, Pacira identified the final 2020 national reimbursement rates for CPT

---

[58] JX 130 at 2.

[59] *Id.* at 1–3; JX 47.

[60] JX 135 at 3–4; PTO ¶ 46.

[61] JX 137. This letter was approved by the Advisory Group. JX 136; Tr. 807:21–809:14 (Still).

[62] *See, e.g.*, JX 138 at 1.

[63] JX 140 at 1.

[64] PTO ¶ 81. The new CPT code 64624 was described as "destruction by neurolytic agent, genicular nerve branches including imaging guidance, when performed." *Id.* ¶ 83; *see* JX

14

code 64624 as $417.56 for the physician office setting, $471.33 for the ASC setting, and $1,871.82 for the hospital outpatient setting.[65]  Based on these rates, Pacira determined that the CMS Reimbursement Milestone for the hospital outpatient setting had been met.[66]  On January 13, 2020, Pacira notified Fortis that the CMS Reimbursement Milestone for the hospital outpatient setting had been triggered,[67] and, on or about May 22, 2020, Pacira paid that milestone.[68]

Fortis appears to have initially believed that the CMS Reimbursement Milestones for the ASC and physician office settings had not been met.  On January 8, 2020, Still sent an email to the other members of the Advisory Group, stating: "[W]e have achieved the Hospital Reimbursement Milestone from CMS for 2020.  The clinic and ASC Milestones were not achieved in 2020; however, we still have until 2023 to achieve partial payment."[69]  The email attached a presentation that listed the national reimbursement rates for CPT codes 64640 and 64624.[70]  The only

---

145 at 3.  The description also includes a parenthetical stating that "64624 requires the destruction of each of the following genicular nerve branches:  superolateral, superomedial, and inferomedial.  If a neurolytic agent for the purposes of destruction is not applied to all of these nerve branches, report 64624 with modifier 52."  PTO ¶ 83; *see* JX 145 at 7.

[65] JX 145 at 5; JX 146 at 2.

[66] PTO ¶ 81; JX 143.  A reimbursement rate of at least $1,400 was required to trigger the CMS Reimbursement Milestone for the hospital outpatient setting.  JX 101 § 1.15(a)(iv)(3).

[67] PTO ¶ 85; JX 161.

[68] PTO ¶ 86.

[69] JX 159 at 1.

[70] *Id.* at 5–8.

immediate concern raised by any member of the Advisory Group or individual at Fortis upon Pacira's notification was Still's admonition that payment for the hospital outpatient milestone should be made sooner.[71]

A few months later, Fortis took a more aggressive approach. On May 29, 2020, after Pacira made the hospital outpatient milestone payment, Fortis sent a letter to Pacira asserting that the CMS Reimbursement Milestones in the ASC and physician office settings had been met under the final 2020 CMS reimbursement rates.[72] Fortis pointed to several CPT codes other than 64640 and 64624 and contended that locality-adjusted rates or combination billing yielded rates in excess of the payment threshold for the outstanding milestones.[73]

## G. Procedural History

On August 21, 2020, Plaintiffs commenced this action, filing claims against Fortis and various individual defendants.[74] On October 5, 2020, Fortis filed a partial

---

[71] JX 162 at 1.

[72] PTO ¶ 87; JX 192.

[73] JX 192. Fortis has since modified the list and combinations of CPT codes it believes entitle the Escrow Participants to the Milestone Payments for the CMS Reimbursement Milestones in the ASC and physician office settings. *Compare id.*, *with* Def.'s Answering & Opening Br. 24–25.

[74] Dkt. 1. The individual defendants were Still, Gumballa Kris Kumar, and Jessica Preciado. Dkt. 1. Kumar was MyoScience's head of product management and marketing at the time of the merger. PTO ¶ 54. Post-merger, Kumar worked as a consultant for Pacira for approximately six months. *Id.* Preciado was MyoScience's director of clinical operations at the time of the merger. *Id.* ¶ 53. Post-merger, Preciado worked at Pacira in various capacities until August 2020. *Id.*

motion to dismiss, submitted an answer, and asserted a counterclaim against Pacira.[75] That same day, the individual defendants moved to dismiss all claims against them.[76] On October 25, 2021, the court granted both motions to dismiss in their entirety, with the only remaining claims being Plaintiffs' claim for declaratory judgment and Defendant's mirror-image counterclaim for breach of contract.[77]

As trial approached, the parties collectively filed four motions *in limine*, two of which warrant discussion. Plaintiffs indicated that they intended to introduce evidence and argument regarding reimbursement for and usage of specific CPT codes with iovera. Defendant contended that Plaintiffs sprung this theory on Defendant on the eve of trial and failed to put Defendant on notice of this theory during fact discovery. In response, Defendant moved to exclude all argument and evidence regarding reimbursement and usage.[78] Defendant did not request a remedy other than the wholesale exclusion of all evidence and argument on the subjects, but did proffer Andrea Trescot, M.D. as a fact witness on the subject shortly before trial, should Defendant's motion *in limine* fail. Plaintiffs opposed Defendant's motion, contending that reimbursement and usage were relevant and that Plaintiffs had put

---

[75] Dkts. 12–13.

[76] Dkt. 14.

[77] Dkt. 56.

[78] Dkt. 122; Dkt. 143 ¶¶ 7–8.

Defendant on notice of the theory earlier in the case.[79]  Separately, Plaintiffs sought to exclude Trescot's testimony on the grounds that Defendant did not identify Trescot until after the close of fact discovery.[80]  The court denied both motions, allowing argument and evidence on reimbursement and usage and permitting Trescot to testify as a fact witness at trial.[81]  The court held trial from September 19 to 21, 2023, and, after briefing, heard post-trial argument on March 11, 2024.[82]

## II.    ANALYSIS

The parties dispute only whether the conditions precedent set forth in Sections 1.15(a)(iv)(1)(A), 1.15(a)(iv)(1)(B), and 1.15(a)(iv)(2)(A) of the Merger Agreement have been satisfied (the "Disputed Milestones").  Defendant contends that the Disputed Milestones were triggered in 2020 by locality-adjusted reimbursement rates for CPT codes 64600, 64640, and 64681, and by local or national

---

[79] Dkt. 136.

[80] Dkt. 123.

[81] Dkt. 177 at 54:22–56:9, 56:24–57:11; Dkts. 170–71.

[82] Dkts. 178, 184, 189, 191, 193, 195.  During the pendency of this action, CMS issued new reimbursement rates, effective January 1, 2021.  The 2021 national reimbursement rates for CPT code 64624 in the hospital outpatient, ASC, and physician office settings were $1,754.39, $804.72, and $424.65, respectively.  JX 231 at 26–27.  On January 18, 2021, Pacira notified Fortis that the CMS Reimbursement Milestone for the ASC setting had been met for calendar year 2021 and confirmed that Pacira would pay $10 million, less any applicable deductions and withholdings.  PTO ¶ 91; JX 207.  Pacira made that milestone payment on May 28, 2021.  PTO ¶ 92.

reimbursement rates for CPT codes 64605 and 64610.[83]  Plaintiffs argue that only

national reimbursement rates for CPT code 64624 can trigger the Disputed

Milestones and that, in any event, iovera must have been used for a procedure

described by the triggering CPT code.  The dispositive disputes can be distilled into

two questions.  First, must one look to the "national" or "locality-adjusted"

reimbursement rate to determine whether a Disputed Milestone was triggered?

Second, which CPT codes can trigger the Disputed Milestones?  The resolution of

these questions is the province of well-settled principles of contract interpretation.

### A.    Standard of Review

The Declaratory Judgment Act authorizes Delaware courts to "declare rights,

status and other legal relations whether or not further relief is or could be claimed."

10 *Del. C.* § 6501.  A party "may have determined any question of construction or

validity arising under [a] contract . . . and obtain a declaration of rights, status or

other legal relations thereunder."  *Id.* § 6502.  Plaintiffs seek a declaration that no

sums are owed under the Disputed Milestones.  Defendant's counterclaim is the

other side of the coin; Defendant argues that Pacira breached the Merger Agreement

by failing to make payments under the Disputed Milestones.

---

[83] *See* Def.'s Answering & Opening Br. 24–25.  For some of these codes, Defendant also adds the value of CPT code 76942 or counts the value of the code multiple times, but while the parties spar over the propriety of each of those approaches as well, the court need not reach these issues.

19

Neither party disputes that the Merger Agreement is a valid and binding contract,[84] and neither party contests the calculation of the remedy the other seeks. The sole dispute is the proper construction of the Merger Agreement.[85]

"The proper construction of any contract . . . is purely a question of law." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). The court must review the Merger Agreement using the well-established principles of contract construction to ascertain what the parties intended. *See GreenStar IH Rep, LLC v. Tutor Perini Corp.*, 2017 WL 5035567, at *6 (Del. Ch. Oct. 31, 2017) (interpreting an earnout provision in a merger agreement and explaining that the court is "bound by the language within the contract unless that language is ambiguous" and that "the role of a court . . . is to effectuate the parties' intent" (internal quotation marks omitted)), *aff'd*, 186 A.3d 799 (Del. 2018) (TABLE).

In reviewing merger agreements and other contracts, Delaware courts "adhere[] to the 'objective' theory of contracts, *i.e.* a contract's construction should be that which would be understood by an objective, reasonable third party." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (internal quotation marks

---

[84] Dkt. 1 ¶ 260; Dkt. 12 at 123.

[85] While the burden may vary between the parties' respective claims, see *State Farm Mutual Automobile Insurance Co. v. Spine Care Delaware, LLC*, 238 A.3d 850, 860 n.55 (Del. 2020), the evidence here is not in equipoise, so who bears the burden is immaterial.

omitted).  The court must read the contract "as a whole and enforce the plain meaning of clear and unambiguous language."  *Manti Hldgs., LLC v. Authentix Acq. Co.*, 261 A.3d 1199, 1208 (Del. 2021).  If the contractual language is clear, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."  *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (internal quotation marks omitted).  Contractual language is clear "[w]hen the plain, common, and ordinary meaning of the words lends itself to only one reasonable interpretation."  *Sassano v. CIBC World Mkts. Corp.*, 948 A.2d 453, 462 (Del. Ch. 2008).

If a contract's language is ambiguous, then the court must look to other sources to determine what an objectively reasonable third party would have understood the parties' intent to be.  *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 834–35 (Del. Ch. 2007).  "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction.  Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."  *Rhone-Poulenc*, 616 A.2d at 1196.  Nor is a contract unambiguous simply because both sides contend that its meaning is plain.  *See Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 847 n.68 (Del. 2019) (explaining that

21

"whether a contract is unambiguous is a question of law; this Court cannot find an ambiguous contract unambiguous because each party interprets the contract differently to find it unambiguous"). Ambiguity exists if "the provisions in controversy are fairly susceptible of different interpretations." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997). "The determination of ambiguity lies within the sole province of the court." *Osborn*, 991 A.2d at 1160. "[T]he introduction of extrinsic, parol evidence does not alter or deviate from Delaware's adherence to the objective theory of contracts"; rather, "the extrinsic evidence may render an ambiguous contract clear so that an 'objectively reasonable party in the position of either bargainer would have understood the nature of the contractual rights and duties to be.'" *United Rentals*, 937 A.2d at 835 (quoting *U.S. W., Inc. v. Time Warner Inc.*, 1996 WL 307445, at *10 (Del. Ch. June 6, 1996)).

The crux of the parties' dispute is whether the Disputed Milestones were triggered, thus requiring Pacira to make the corresponding payments. The parties' claims turn on two determinations: (1) whether "CMS Reimbursement" rate refers to the national or locality-adjusted reimbursement rates, and (2) whether "a different code that is appropriate to describe a procedure in which the Smart Tip Products are used" encompasses all CPT codes that could theoretically be used to reimburse for iovera. The starting point for each of these inquiries is the Merger Agreement and the words that the contracting parties chose to govern their rights and obligations.

22

**B.** **The Defined Term "CMS Reimbursement" is Ambiguous, but the Extrinsic Evidence Demonstrates that the Parties Intended the Disputed Milestones to Be Triggered by the National Reimbursement Rate.**

The parties' first dispute concerns whether the "national" or a "locality-adjusted" reimbursement rate is the appropriate metric for determining whether reimbursement for a given CPT code exceeds a milestone threshold.

**1.** **The plain language of the Disputed Milestones regarding the reimbursement rate is ambiguous.**

The court starts with the plain language of the Disputed Milestones, which provides that "[Pacira] will pay . . . if the CMS Reimbursement is effective . . . in an amount equal to or greater than [$600.00/$800.00] per such procedure . . . ."[86] In turn, the Merger Agreement defines "CMS Reimbursement" as "the reimbursement scheme authorized and approved by the Centers for Medicare & Medicaid Services for the relevant procedure that involves the use of the Company product."[87] The court must determine the "amount" at which the CMS "reimbursement scheme" is "effective" for a procedure related to the use of iovera to determine if the Disputed Milestones are owed. The key dispute here is over the meaning of "reimbursement scheme."

---

[86] JX 101 §§ 1.15(a)(iv)(1)–(2). Aside from the threshold amounts and site of service, the relevant language is substantively identical for each of the Disputed Milestones.

[87] *Id.* at 101.

23

Defendant argues that "reimbursement scheme" refers to the locality-adjusted reimbursement rates because that is what a medical care provider gets paid, prior to any reductions. Defendant contends that the "scheme" refers to the system of locality-adjusted reimbursement rates with respect to each CPT code, not the generalized benchmark national rates. In sum, Defendant argues that the language requires payment if, pursuant to the scheme for geographic adjustment calculations, any single locality-adjusted reimbursement rate for a relevant code exceeds the payment threshold.

By contrast, Plaintiffs contend that "reimbursement scheme" refers to the broader system of national reimbursement rates promulgated by CMS, and that the national rate for a relevant CPT code is the correct metric. In other words, Plaintiffs argue that the language requires payment only if, under CMS's scheme of national benchmark reimbursement rates, the national rate for a relevant code exceeds the payment threshold.

The parties advance only these two metrics, and no other value against which to measure the Disputed Milestones is compelled by the Merger Agreement's plain language. Neither interpretation is especially compelling based only on the language in the Merger Agreement, but both are metrics from which one can determine an "effective" "amount," and each plays a significant role in a "reimbursement scheme."

Each side advances a slew of arguments as to why its construction is the only reasonable one, but neither party can muster a conclusive refutation of the other's interpretation. Neither side finds specific language in the Merger Agreement to bolster their own interpretation or to undermine the other side's construction. The defined term "CMS Reimbursement" is used only in the CMS Reimbursement Milestones; there is no other reference to CMS in the Merger Agreement and neither side proffers support for its interpretation from other language in the four corners of the contract. Nor does the concept of a national or locality-adjusted reimbursement rate appear in the pertinent language or draw direct support from words used elsewhere in the agreement. Both parties' interpretations can be reasonably traced to the broad, sparse language in Section 1.15(a) and the definition of CMS Reimbursement, but neither interpretation finds strong enough foothold to firmly displace the other. Rather, the words on the page of the Merger Agreement leave plenty of room for both interpretations. Finally, each party offers arguments as to why the other's interpretation might be unnatural or ill-advised. For example, Defendant highlights that the national reimbursement rate is "a fictional number, not a reimbursement payment value,"[88] and Plaintiffs contend that "monitoring hundreds of locality-adjusted rates across three sites of service over four years would

---

[88] Def.'s Answering & Opening Br. 38.

25

be a massive burden that no rational party would have (tacitly) agreed to undertake."[89] But the national rate does not need to be an actual reimbursement payment value to serve as a metric for an earnout, and Plaintiffs' hyperbole about the "burden" of occasionally multiplying the highest locality modifiers against the handful of potentially applicable code inputs is unpersuasive. Neither side convinces the court that the other's construction "produces an absurd result or one that no reasonable person would have accepted when entering the contract." *Osborn*, 991 A.2d at 1160.

When faced with two reasonable interpretations of a contract, the court does not simply end the inquiry by deciding which of two reasonable interpretations is "more" reasonable. *Terrell v. Kiromic Biopharma, Inc.*, No. 131, 2024, slip op. at 12 (Del. Jan. 21, 2025) (explaining that a "trial court cannot choose between two reasonable interpretations of an ambiguous contract" as a matter of law); *Bank of N.Y. Mellon v. Commerzbank Cap. Funding Tr. II*, 65 A.3d 539, 550 (Del. 2013) ("Although the more natural reading is a factor to be considered, it does not conclude the analysis. Even a less natural reading of a contract term may be reasonable for purposes of an ambiguity inquiry." (cleaned up)); *AM Gen. Hldgs. LLC v. Renco Gp., Inc.*, 2017 WL 2167193, at *2 n.8 (Del. Ch. May 17, 2017) ("Even if the Court

---

[89] Pls.' Reply & Answering Br. 13.

determines that one party's reading of the contract is more reasonable or 'natural,' that does not preclude a finding of ambiguity."), *reargument denied*, 2017 WL 3046819 (Del. Ch. July 18, 2017); *Cities Serv. Co. v. Gardinier, Inc.*, 344 A.2d 254, 259 n.7 (Del. Super. 1975) (denying summary judgment despite one side having acknowledged that the other's interpretation was "the more reasonable among the two possible interpretations arising out of the ambiguity," explaining that "extrinsic evidence may, in fact, demonstrate" that the parties agreed to the second, nevertheless reasonable interpretation), *appeal refused*, 349 A.2d 744 (Del. 1975).

The court's role in interpreting a contract is to give effect to the parties' intent. The parties' intent is the central focus, and if the court cannot determine the parties' intent from the agreement's language, the court turns to the extrinsic evidence. *See United Rentals*, 937 A.2d at 835 (explaining that "the extrinsic evidence may render an ambiguous contract clear"); *see also Martin Marietta Mat'ls, Inc. v. Vulcan Mat'ls Co.*, 56 A.3d 1072, 1105–06 (Del. Ch. 2012) (observing that the court first looks to "the plain and unambiguous terms of a contract as the binding expression of the parties' intent" but "if words in the contract are ambiguous, then [the court] must look to extrinsic evidence to determine the parties' intent"), *aff'd*, 45 A.3d 148 (Del. 2012) (TABLE), *and aff'd*, 68 A.3d 1208 (Del. 2012), *as corrected* (July 12, 2012).

27

This is the course the court must follow here to determine what the parties meant by "CMS Reimbursement." Both interpretations point to metrics that fall within the un-specific language at issue and are reasonable interpretations of the Disputed Milestones. The ambiguity or uncertainty in issue is plainly discernable from a reading of the Merger Agreement without consideration of any extrinsic evidence. Therefore, the Merger Agreement is ambiguous as to the appropriate metric, and the court must turn to extrinsic evidence to determine the parties' shared intent at the time of contracting.

> **2. The extrinsic evidence demonstrates that the parties intended to tie the Disputed Milestones to a national reimbursement rate.**

The extrinsic evidence overwhelmingly indicates that the parties' shared intent at the time of the Merger Agreement was for the national reimbursement rates to serve as the relevant metric. First, the parties discussed national reimbursement rates throughout their negotiations, but never discussed that the thresholds in the CMS Reimbursement Milestones could be triggered by locality-adjusted reimbursement rates.[90] For example, MyoScience's presentations to Pacira in October 2018 and January 2019 provided only the national reimbursement rates for

---

[90] *See, e.g.*, Tr. 600:16–601:10 (Farley) (explaining that MyoScience only looked at the national reimbursement rates when analyzing the potential reimbursement rates that would apply for CPT code 64xx1).

CPT code 64640 in the hospital outpatient, ASC, and physician office settings.[91]

Ron Ellis, Pacira's chief strategy officer, testified that he understood that the reimbursement rates discussed by the parties were the national reimbursement rates.[92] No one from MyoScience looked into any locality-adjusted reimbursement rates during the parties' negotiations,[93] and Stack was not even aware that locality-adjusted reimbursement rates existed for medical devices.[94] The pre-merger evidence alone supports a finding that both parties understood and intended for the Disputed Milestones to be triggered, if at all, by the national reimbursement rates.

Second, evidence from after the Merger Agreement's execution further confirms that the parties had intended for the national reimbursement rates to serve as the relevant metric.[95] As CMS announced the proposed and finalized

---

[91] JX 24 (native) at 50 (October 24, 2018 presentation listing national reimbursement rates for the three sites of service); Tr. 126:1–4 (Ellis) (confirming the reimbursement rates in the October 24, 2018 presentation were the national rates); JX 66 at 5 (January 9, 2019 presentation listing national reimbursement rates for the three sites of service).

[92] Tr. 139:17–23 (Ellis); PTO ¶ 45.

[93] Pensaert Dep. at 219:13–22.

[94] Tr. 32:14–33:3 (Stack) (explaining that his "prior experience was in pharmaceuticals. And I was aware that that would be common practice in pharmaceuticals, but I didn't have any previous device experience. And so I did not understand that, no.").

[95] Defendant broadly avers to the following language in Section 9.2 of the Merger Agreement:

> No prior draft of this Agreement nor any course of performance or course of dealing shall be used in the interpretation or construction of this Agreement. No parole evidence shall be introduced in the construction or interpretation

reimbursement rates in July and November 2019, the parties' correspondence between each other and internally reflected only the national reimbursement rates.[96]

of this Agreement unless the ambiguity or uncertainty in issue is plainly discernable from a reading of this Agreement without consideration of any extrinsic evidence.

JX 101 § 9.2. Through this language, the parties to the Merger Agreement permissibly agreed that prior drafts, course of performance, and course of dealing would not be used to interpret or construe the Merger Agreement. *See Tex. Pac. Land Corp. v. Horizon Kinetics LLC*, 306 A.3d 530, 552–53 (Del. Ch. 2023) ("The No Drafting History Clause is a rational way for parties to address known risks. . . . Ambiguity is a known risk, and parties can contract to address that risk. . . . Enforcing the clause also seems warranted because it does not unduly burden the court's ability to consider relevant evidence. It allows the parties to agree on what evidence is relevant."), *aff'd*, 314 A.3d 685 (Del. 2024) (TABLE). Section 9.2 also recites Delaware's well-established rule regarding extrinsic evidence. *See Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, 273 A.3d 752, 760 (Del. 2022) ("We do not consider extrinsic evidence unless we find that the text is ambiguous."), *reargument denied* (Mar. 22, 2022).

For the avoidance of doubt, the court does not consider the parties' prior drafts in interpreting the Merger Agreement. Nor does the court consider the parties' course of performance which, here, amounts to Pacira's payment and Fortis's acceptance of the two undisputed Milestone Payments. *See Motors Liquid. Co., Dip Lenders Tr. v. Allianz Ins. Co.*, 2013 WL 7095859, at *5 (Del. Super. Dec. 31, 2013) ("Course of performance is a sequence of conduct where: (1) the agreement of the parties involves repeated occasions for performance by a party; and (2) the other party knowingly accepts the performance or acquiesces in it without objection."), *aff'd*, 191 A.3d 1109 (Del. 2018) (TABLE). Finally, the parties here have no course of dealing to consider. *See* Restatement (Second) of Contracts § 223 (Am. L. Inst. 1981) [hereinafter "Restatement (Second) of Contracts"] ("A course of dealing is a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.").

[96] In July 2019, CMS issued proposed reimbursement rates for 2020. Pacira reviewed only the proposed national reimbursement rates for CPT code 64xx1 and determined that "no iovera milestone [was] triggered." JX 125 at 2; Tr. 172:8–173:9 (Ellis) (explaining that the reimbursement rates identified in JX 125 "reflect the national reimbursement for the proposed CPT code 64xx1 by the three sites of care"). The internal Pacira email was forwarded to Still, who then forwarded it to Daubert and Farley. JX 126 at 1–3. None of

For months, former MyoScience securityholders' only concerns were that Pacira might not be effectively advocating for rate increases and that Pacira's proposed payment timeline was slow.[97]  In reaction to the finalized national reimbursement rates, MyoScience's former chief executive officer lamented that, based on the

them discussed the possibility that the locality-adjusted reimbursement rates should be considered.

In November 2019, again referring only to the national reimbursement rates for CPT code 64624 (the finalized version of 64xx1), Ellis told Stack that "it now appears that CMS granted a healthy increase in [the hospital outpatient setting], triggering a $10M milestone payment."  JX 150 at 1, 4; *see* Tr. 176:15–177:5 (Ellis); *see also* JX 143 at 1.

In the months following the November 2019 rate announcements, MyoScience securityholders and their representatives consistently indicated that they believed that they had missed the Disputed Milestones based on the national reimbursement rate.  Between November 2019 and January 2020, Still repeatedly told Fortis and other MyoScience securityholders that only the hospital outpatient milestone had been met and that the ASC and physician office milestones had not been met. JX 153 at 1 (November 26, 2019 email from Still to Lando stating that it "looks good for CMS milestone for hospital; Clinic is close; ASC won't happen for 2020"); JX 159 at 1, 3–8 (January 8, 2020 email from Still forwarding Pacira's presentation showing only the national reimbursement rates for CPT codes 64640 and 64624 to Fortis and the Advisory Group, stating:  "You will see from the attached that we have achieved the Hospital Reimbursement Milestone from CMS for 2020.  The clinic and ASC milestones were not achieved in 2020; however, we still have until 2023 to achieve partial payment."); JX 163 at 1 (January 22, 2020 email from Still to Andrew Jones, MyoScience's vice president of finance, stating that the CMS reimbursement rate for the physician office setting was "$26 dollars short for 2020.... wound up costing us $10M").  In January 2020, Kumar stated to Still:  "Unfortunately, we did not trigger the milestone for clinic payment," citing only the "nat'l avg" for CPT code 64624.  JX 159 at 2.

[97] *See, e.g.*, JX 162 at 1 (discussing former MyoScience securityholders' desire for earlier payment and basis for contending that the hospital outpatient milestone should be paid at the end of February, rather than waiting until June 1); JX 138 at 1 (email from Pensaert to Valiance stating that "we will need to monitor closely whether Pacira is making all reasonable efforts to obtain the reimbursement levels as agreed, which risks delaying reimbursement until 2021" and thus "reduc[ing] the potential CMS Reimbursement Milestone . . . from a total of $50,000,000 to $30,000,000").

31

national reimbursement rate for 64640, "we were a mere $24.00 short."[98] Both pre-merger and post-merger evidence confirms Plaintiffs' interpretation.

Where, then, did the locality-adjusted reimbursement rate theory originate? Plaintiffs persuasively showed that a consultant devised the theory in the spring of 2020.[99] When the consultant first proposed the concept, Farley expressed skepticism as to its viability, emailing Still his concerns that "[i]t's unclear from this presentation how we hope to use the argument that in certain locations such as Santa Clara county, the $600 milestone threshold is achieved."[100] Still explained that "We will try to argue that our milestone has been met - even though national average is light.... We'll see :)."[101] To Defendant's credit, its consultant proffered a reasonable interpretation of the relevant language. But proffering a reasonable interpretation of ambiguous language cannot, alone, carry the day. Defendant's attempt to show that the parties intended to use the locality-adjusted reimbursement rates falls apart once the court reaches the extrinsic evidence, which shows that Defendant's position lacks support in the record.

Based on the extrinsic evidence, the court finds that the parties' shared understanding at the time of contracting was that the Disputed Milestones could be

---

[98] JX 169 at 1.

[99] *See* JX 173; JX 174; JX 178; JX 184; JX 183.

[100] JX 183 at 1.

[101] *Id.*

triggered only if the national reimbursement rate for certain CPT codes exceeded the threshold for the relevant care settings. This is not, however, the end of the inquiry. The court must now decide whether and the extent to which the Disputed Milestones can be triggered by reimbursement rates for CPT codes other than 64624.

**C.** **The Disputed Milestones Can Be Triggered by Any CPT Code Appropriate to Describe a Procedure for Which iovera Is Actually Used, but Defendant Has Not Shown that the Reimbursement Rate for Any Other Applicable Code Exceeded the Threshold for Payment.**

The parties next dispute whether the Disputed Milestones can be triggered by CPT codes other than 64xx1, as finalized. Plaintiffs contend that the unambiguous language of the Merger Agreement provides that 64624 is the only CPT code that can trigger the Disputed Milestones. Defendant contends that other CPT codes can trigger the Disputed Milestones.

**1.** **CPT codes other than 64624 can trigger the Disputed Milestones but iovera must have actually been used for a procedure appropriately described by such CPT code.**

The pertinent language from the Merger Agreement provides for payment of each Disputed Milestone:

> [I]n the case of reimbursement related to use of the Smart Tip Products to treat a patient in [a given care] setting, [] if CMS Reimbursement is effective [] in an amount equal to or greater than [$600.00/$800.00] per such procedure using such product pursuant to CPT Code 64xx1 (or a different code that is appropriate to describe a procedure in which the Smart Tip Products are used).[102]

---

[102] JX 101 §§ 1.15(a)(iv)(1)–(2).

33

Plaintiffs contend that, under this language, the Disputed Milestones can only be triggered by reimbursement rates for CPT code 64624 that exceed the specified threshold amount. Defendant argues that the phrase "or a different code" unambiguously provides that CPT codes other than 64xx1 can trigger the Disputed Milestones, highlighting that nothing in the Disputed Milestones indicates that the parenthetical modifies 64xx1. Plaintiffs counter that the parenthetical serves only to modify "64xx1" to address what Plaintiffs argue is the risk that 64xx1 would be finalized in another family of codes. Not so.

"64xx1" referred to what was, at the time of the Merger Agreement, a provisional, yet-to-be-finalized CPT code. And there is precedent for CPT codes being finalized in "code families" other than their provisional code.[103] But once finalized, regardless of what the final number ended up being, which CPT code had been finalized from 64xx1 would be objectively verifiable.[104] Therefore, reference

---

[103] Tr. 278:11–279:20 (Kahan) (explaining that placeholder code 37x01 had been finalized as CPT code 30469, in a different "family" of codes).

[104] Even if a placeholder code is finalized in a different family of codes, the federal register provides information in an appendix to the final rule with which one can identify the final CPT code's placeholder predecessor. *Id.* at 278:11–279:20 (Kahan) ("A: "[W]e know that [30469] was the code that was finalized from the [37x01] placeholder code because the federal register gives us that information in an appendix to their final rule. Q: So this is all publicly available information? A: It is.").

to "CPT Code 64xx1" in a merger agreement dated March 4, 2019,[105] was sufficient to identify the finalized code in 2020. Plaintiffs' interpretation, therefore, renders the entire parenthetical surplusage. *See NAMA Hldgs., LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007) ("Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court."), *aff'd*, 945 A.2d 594 (Del. 2008) (TABLE).

Construing the parenthetical to refer to CPT codes other than 64624 gives that language meaning. Plaintiffs insist, however, that reading the parenthetical to include other CPT codes renders "64xx1" meaningless surplusage. It does not, for at least two reasons.

First, Defendant's interpretation creates two categories of CPT codes for potential Milestone Payments: 64xx1 or a "different" code. 64xx1 is *not* a different code from 64xx1. Therefore, Plaintiffs' argument boils down to, essentially, a complaint that Defendant's interpretation could have been said in fewer words.[106] But concision, though a virtue, is not a principle of contract interpretation.

---

[105] 64xx1, like other placeholder codes, can be, and actually was, reused after CPT code 64624 was finalized. *See* JX 231 ¶ 37. Placeholder codes are, however, only reused once the first proposed codes are finalized, so, on March 4, 2019—the date of the Merger Agreement—there was only one "64xx1." *See id.* ¶¶ 36–38 (explaining that a placeholder code is only given a permanent CPT code number once the application is accepted and showing that the placeholder code "64xx1" was not reused until 2022).

[106] In Plaintiffs' words, "why single out 64xx1 at all?" Pls.' Opening Br. 21.

Second, under the plain language of the Merger Agreement, 64xx1 and "different" codes are not treated the same for purposes of determining whether a Disputed Milestone is achieved. The main phrase requires only that CMS reimbursement be "effective" for 64xx1. By contrast, the parenthetical requires that "different" codes describe a procedure in which the Smart Tip Products (*i.e.*, iovera) "are used."

A version of the word "use" appears in the relevant provisions three times: first, in the opening clause, "in the case of reimbursement related to use of the Smart Tip Products to treat a patient in [a given] setting"; second, in the core of the main clause, "per such procedure using such product pursuant to"; and third, in the parenthetical, "code that is appropriate to describe a procedure in which the Smart Tip Products are used."[107] The second instance falls within a phrase referring back to the first ("such procedure using such product"). Thus, there are, in effect, two constructions, which differ materially in structure. *Compare* ("in the case of reimbursement related to use of the Smart Tip Products to treat a patient in [a given setting]"), *with* ("a procedure in which the Smart Tip Products are used"). If the parenthetical were intended to have the same meaning, the drafters knew how to employ phrasing to do so. They did not; therefore, it is reasonable to conclude that

---

[107] JX 101 §§ 1.15(a)(iv)(1)–(2).

they intended another meaning—and one is plainly apparent. The first instance contemplates hypothetical use; "in the case of reimbursement related to use" indicates that the milestone does not, necessarily, require *actual* use. *See City of Newark v. Donald M. Durkin Contr., Inc.*, 305 A.3d 674, 680 (Del. 2023) ("Delaware courts recognize the phrases 'relating to' and 'arising out of' as 'paradigmatically broad terms.'" (quoting *Lillis v. AT & T Corp.*, 904 A.2d 325, 331 (Del. Ch. 2006))). By contrast, the parenthetical uses direct language requiring actual use, referring to "a procedure in which the Smart Tip Products *are used*." Moreover, were the language in the parenthetical not intended to provide "different" codes with different treatment than 64xx1, all of the parenthetical other than "or a different code" would be surplusage, as prior language in each Disputed Milestone already specifies that any triggering code pertains to reimbursement related to use of iovera in the specified setting. Therefore, construing 64xx1 as not requiring actual use and "different" codes as requiring actual use to trigger a Disputed Milestone affords full meaning not only to "or a different code" but also the rest of the parenthetical. *See Manti Hldgs.*, 261 A.3d at 1208 ("Contracts will be interpreted to 'give each provision and term effect' and not render any terms 'meaningless or illusory.'" (quoting *Osborn*, 991 A.2d at 1159)); *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010) (explaining that the court "will

37

read a contract as a whole and . . . will give each provision and term effect, so as not to render any part of the contract mere surplusage").

Although the plain language of the Merger Agreement allows for Milestone Payments under CPT codes "different" from 64624, Defendant's argument that it does not need to show actual use of a code to trigger a Milestone Payment under a different code is incorrect. This interpretation lacks support in the plain language of the Merger Agreement, and Defendant's flurry of counterarguments is unavailing. First, Defendant points to the word "effective" in the main phrase and contends that being "effective" is the only requirement. But, as the court has already explained, the parenthetical imposes an additional requirement for "different" CPT codes— they must be both effective *and* used. Next, Defendant highlights that there is no express language in the Merger Agreement which requires Fortis to provide evidence of usage—but the absence of such requirement does not make the usage condition unreasonable. In any event, here Pacira bears the burden of providing calculations with respect to Milestone Payments it believes to have been triggered, while Fortis is required only to submit a basis for payment if it is submitting a milestone objection notice.[108] Defendant also halfheartedly contends that Pacira

---

[108] *Id.* § 1.15(f). For example, it was Pacira that notified Fortis that two separate CMS Reimbursement Milestones had been achieved with respect to CPT code 64624 and then proceeded to pay the applicable milestones. PTO ¶¶ 85–86, 91–92.

prevented use by taking iovera off the market in 2020. As Plaintiffs clarify on reply, Pacira did elect not to seek new customers for the first-generation iovera device, but did so in response to reliability issues with the first-generation device, and, despite not seeking new customers, continued servicing older devices.[109] And, once the second-generation device was completed, Pacira relaunched its marketing efforts at the beginning of 2022, with two years remaining in the Milestone Achievement Period.[110] Defendant makes no attempt to show materiality,[111] wrongfulness,[112] or

---

Defendant also contends that actual use is not required because Pacira paid two CMS Reimbursement Milestones without requesting proof of physician usage. This argument fails for several reasons. First, this is extrinsic evidence. *See Eagle Indus.*, 702 A.2d at 1232 ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity."). Second, it is evidence the parties agreed to exclude from interpretation of the Merger Agreement. JX 101 § 9.2 ("No prior draft of this Agreement *nor any course of performance* or course of dealing *shall be used in the interpretation or construction of this Agreement.*" (emphasis added)). Third, in any event, those two CMS Reimbursement Milestones were triggered by CPT code 64624, with respect to which, under the unambiguous language of the Merger Agreement, Pacira's payment obligation is not conditioned on use.

[109] Tr. 33:11–34:4 (Stack).

[110] *Id.* at 34:11–17 (Stack). Stack also testified that COVID-19 and supply chain issues negatively affected Pacira's marketing efforts and product development. *Id.* at 34:5–11, 34:19–23 (Stack).

[111] *WaveDivision Hldgs., LLC v. Millennium Digit. Media Sys., LLC*, 2010 WL 3706624, at *14 (Del. Ch. Sept. 17, 2010) ("[W]here a party's breach by nonperformance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused." (internal quotation marks omitted)).

[112] *Mobile Commc'ns Corp. of Am. v. Mci Commc'ns Corp.*, 1985 WL 11574, at *4 (Del. Ch. Aug. 27, 1985) ("[A] party may not escape contractual liability by reliance upon the failure of a condition precedent where the party wrongfully prevented performance of that condition precedent."); Restatement (Second) of Contracts § 245 ("There is no breach if . . . the lack of cooperation is justifiable.").

the necessary state of mind[113] in response to this evidence. In fact, Defendant abandoned this argument on reply. Instead, Defendant asserted only that Stack's testimony that actual usage was not required "ends the analysis and resolves the issue."[114] It does not. "The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006); *accord Braga Inv. & Advisory LLC v. Yenni Income Opportunities Fund I, L.P.*, 2020 WL 3042236, at *10 (Del. Ch. June 8, 2020) ("The legal effect of the [Merger] Agreement, however, is an issue for the court to decide irrespective of whatever subjective belief [Defendant or Plaintiffs] may have had about its meaning."); *see also Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009) ("Questions concerning the interpretation of contracts are questions of law . . . ."); *Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006) ("Under Delaware law, the proper interpretation of language in a contract is a question of law."); *Talkdesk, Inc. v. DM Trans, LLC*, 2024 WL 2799307, at *13 (Del.

---

[113] 13 Williston on Contracts § 39:10 (4th ed.) (explaining that "the weight of authority holds that in order for prevention to constitute an excuse for nonperformance of a condition or a promise, the preventing party must have deliberately taken steps to impede performance or have arbitrarily impaired the other party's ability to perform").

[114] Def.'s Reply Br. 26.

Super. May 31, 2024) ("Delaware law has long considered contract interpretation a question of law, rather than a question of fact.").

In sum, CPT code 64xx1 triggers the Disputed Milestones if it is effective at a given rate, but the "different" codes only trigger the Disputed Milestones if they are *both* effective and describe procedures for which iovera is actually used. This distinction makes objective sense on the face of the Merger Agreement: 64xx1 refers to a forthcoming code that was not usable prior to its effective date, whereas a "different" code encompasses existing codes that could have been in use at the time of contracting. This is the only interpretation to give meaning and effect to all of the words governing the Disputed Milestones and is supported by the plain, unambiguous language of the provision considered as a whole. *See E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985) ("In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein."); *Holifield v. XRI Inv. Hldgs. LLC*, 304 A.3d 896, 924 (Del. 2023) ("Contracts will be interpreted to give each provision and term effect and not render any terms meaningless or illusory. When a contract is clear and unambiguous, the court will give effect to the plain meaning of the contract's terms and provisions." (internal quotation marks omitted)). Therefore, to establish its entitlement to the Disputed Milestones, Defendant must prove actual use of iovera for a procedure appropriately described by its proffered CPT codes.

41

## 2. Defendant has not shown any use of iovera in a procedure appropriately described by CPT code 64605 or 64610.

After being confined to arguing that a national rate triggered the Disputed Milestones, Defendant is left to argue over CPT codes 64605 and 64610.[115] CPT codes 64605 and 64610 both describe "[d]estruction by neurolytic agent, trigeminal nerve; second and third division branches at foramen ovale," with CPT code 64610 being the appropriate code when the procedure is performed "under radiologic monitoring."[116] These CPT codes do not cover all procedures relating to the trigeminal nerve; for example, CPT code 64600 applies to "[d]estruction by neurolytic agent, trigeminal nerve; supraorbital, infraorbital, mental, or inferior alveolar branch."[117] Therefore, Defendant must prove actual use of iovera for destruction of "trigeminal nerve, second and third division branches *at foramen ovale*" to establish that Pacira is obligated to pay the Disputed Milestones.

Defendant did not carry this burden at trial. Defendant established that iovera has been used to treat other branches of the trigeminal nerve, but not the foramen

---

[115] Post-trial, Defendant argued that the Disputed Milestones were triggered in 2020 by CPT codes 64600, 64605, 64610, 64640, and 64681. But because the court has determined that the Disputed Milestones can only be triggered by national reimbursement rates, Defendant concedes that the national reimbursement rates for CPT codes 64600, 64640, and 64681 do not trigger the Disputed Milestones. *See* Def.'s Answering & Opening Br. 24–25 (arguing that these CPT codes, regardless of whether they were considered alone, stacked, or used in combination with CPT code 76942, only triggered the Disputed Milestones under their local rates).

[116] JX 229 at 5.

[117] *Id.*

42

ovale. Defendant's fact witness on use, Trescot, testified that she has used iovera to treat other areas of the trigeminal nerve but has never treated the foramen ovale with iovera.[118] Defendant also points to a 2018 email discussing areas that could be treated with iovera, which states that MyoScience had "heard of some physicians" treating the trigeminal nerve with iovera, but did not specify the foramen ovale.[119] Therefore, there is no evidence in the post-trial record that iovera has ever been used in a procedure appropriately described by CPT code 64605 or 64610.

---

[118] Tr. 717:10–718:10, 719:21–720:4, 738:23–739:1 (Trescot). Defendant also proffered a photograph Trescot stated was "a cryo probe passing through the foramen ovale," but Trescot conceded that it was not a picture of a procedure she performed, she could not tell from the photograph whether the cryo probe was iovera or another device, and, though she had been told the device was iovera, she had no personal knowledge of whether the device was iovera. *Id.* at 727:14–21, 738:17–739:20 (Trescot). Plaintiffs made timely objections to the introduction of this evidence as hearsay at trial, and the court gave Plaintiffs a continuing objection and leave to address the issue in their post-trial briefing. *Id.* at 727:22–728:4. Plaintiffs raised the issue in both of their post-trial briefs, correctly identifying that Trescot's testimony regarding use of iovera on the foramen ovale was merely repeating a statement by a third party for the truth of the matter asserted. Pls.' Opening Br. 44 n.12; Pls.' Reply & Answering Br. 52. By contrast, while Defendant contends that Trescot "has personally used, or has personal knowledge of the use of, the Smart Tip Products in the trigeminal nerves," Defendant offers no response to Plaintiffs' legal argument that Trescot's testimony about the use of iovera to treat the foramen ovale is inadmissible hearsay. Def.'s Answering & Opening Br. 56; *see also* Def.'s Reply Br. 24 n.22, 28–29 (advancing arguments that other testimony was hearsay but failing to rebut Plaintiffs' argument that Trescot's testimony was hearsay); *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived."). Therefore, the court sustains the Plaintiffs' objection to this testimony on hearsay grounds and excludes it from the post-trial record. Beyond Trescot's excluded testimony, there is nothing indicating that the small, blurry image included in the email located at page six of JX 400 depicts the use of iovera to treat the foramen ovale. *See* JX 400 at 6 (an email sent from Trescot to one of Defendant's attorneys less than a month before trial containing only the subject line "[EXTERNAL] Iovera trigeminal" and the small black and white picture).

[119] JX 15 at 3, 6–7.

Because Defendant has not proved that either CPT code 64605 or 64610 was appropriate to describe a procedure in which iovera has been used, neither can trigger the Disputed Milestones.[120] Defendant does not contend that any other national reimbursement rates triggered the Disputed Milestones and, therefore, cannot establish that Pacira is in breach of the Merger Agreement.

## III. CONCLUSION

The Merger Agreement is ambiguous as to whether the parties intended for the Disputed Milestones to be tied to a national or a locality-adjusted reimbursement rate. Although both sides advance reasonable interpretations of "CMS Reimbursement," the extrinsic evidence confirms that the parties had intended to use the national reimbursement rate.

The earnout provision unambiguously provides that the Disputed Milestones could be triggered by an applicable reimbursement rate for a CPT code other than 64624, but reimbursement under a different CPT code requires a procedure in which iovera has been used. Defendant did not prove that iovera was so used.

---

[120] The parties sparred over a wide variety of additional issues throughout the pre- and post-trial briefing, including whether proof of actual reimbursement was required, the relevance of certain CPT codes exceeding the Disputed Milestones' monetary thresholds prior to execution of the Merger Agreement, the scope of the commercial context the court can consider in interpreting the plain language of a contract, the propriety of stacking multiple CPT codes under the language of the Disputed Milestones, and whether the facility and physician fee should be stacked when calculating reimbursement rates in the ASC setting. But, even if all these questions were resolved in Defendant's favor, the outcome would not change. The court declines to opine upon them in *dicta*.

Plaintiffs are entitled to judgment on Count I of the complaint and Pacira is entitled to judgment on Count I of Defendant's counterclaim. The parties shall confer and submit a final implementing order within ten days of this opinion.